**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Dec 01, 2015

IN RE:

RODNEY FILMORE ROTERT and
ROBERTA LOUISE ROTERT,

       Debtors.

Case No. 14-11257-M
Chapter 7

PHILADELPHIA INDEMNITY
INSURANCE COMPANY,

       Plaintiff,

v.

RODNEY FILMORE ROTERT and
ROBERTA LOUISE ROTERT,

       Defendants.

Adv. No. 14-01038-M

### MEMORANDUM OPINION

Every one of us hides something from time to time.  It may be a holiday gift that you don't want your kids to secretly unwrap before the appointed day, or a favorite t-shirt from college that your spouse has been trying to throw away for the last twenty years.  Some things are harder to hide than others.  Like a multi-million dollar lawsuit, for example, or a fully restored stolen 1967 Camaro.  In this case, the debtors are accused of hiding both of these items.  The question is whether they should get a discharge in bankruptcy.  The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and venue is

proper pursuant to 28 U.S.C. § 1409.[1]  Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a).  This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(J).

### Findings of Fact

In October 2007, three fully restored 1967 Chevrolet Camaros (the "Camaros") were stolen from C & S Classic Cars in Springdale, Arkansas ("C & S").  C & S owned an insurance policy that insured against loss of the Camaros by theft.  The policy was issued by Philadelphia Indemnity Insurance Company ("Philadelphia").  One of those cars (the "Rotert Camaro") found its way into the hands of Rodney Rotert ("Mr. Rotert"), one of the defendants in this adversary proceeding.  We have two completely different stories as to how Mr. Rotert acquired the Rotert Camaro.  The first story is told by Mr. Rotert.  The second comes from a person who helped steal the Camaros and the detective who investigated their theft.  Only one of the stories can be true.

*Acquisition of the Rotert Camaro According to Mr. Rotert*

According to Mr. Rotert, a gentleman named Victor Revilla ("Mr. Revilla") approached Mr. Rotert in the fall of 2007 and asked if Mr. Rotert wanted to buy a 1967 Camaro.  The Rotert Camaro had been presented to Mr. Rotert for inspection by Jerry Stephenson ("Mr. Stephenson") a few days prior to the meeting between Mr. Rotert and Mr. Revilla.  After meeting with Mr. Revilla, Mr. Rotert decided to purchase the Rotert Camaro.  The parties agreed on a price of $15,000 plus the transfer of a Mazda RX8 from Mr. Rotert.  The $15,000 was paid in cash in three separate installments.  Mr. Rotert has no records to support his allegation that he made the cash payments.[2]  Mr. Rotert testified

---

[1]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

[2]  Initially, Mr. Rotert testified that one of the payments was made in the form of a cashier's check.  Upon being presented with inconsistent testimony from a prior deposition, Mr. Rotert

that although both Mr. Stephenson and Mr. Revilla promised to deliver title to the Rotert Camaro, they never did so. Mr. Rotert testified that he went forward with the transaction even though he never received title to the Rotert Camaro because Mr. Stephenson assured him that Mr. Revilla had title to and in fact owned the vehicle. At the time he allegedly relied upon the representations of Mr. Stephenson, Mr. Rotert admitted he was aware of Mr. Stephenson's reputation for engaging in criminal activity. As will be explained *infra*, the reputation was well deserved. In any event, at the end of 2007, according to Mr. Rotert, he was the rightful owner of the Rotert Camaro, but was left without a certificate of title.

*Acquisition of the Rotert Camaro According to Mr. Revilla and Detective Ryden*

Mr. Revilla testified that he never in his life owned a 1967 Camaro. He categorically denied ever selling such a vehicle to Mr. Rotert, or having any discussions with Mr. Rotert regarding the sale of the Rotert Camaro. Mr. Revilla denied receiving any cash from Mr. Rotert, except for remodeling services performed by Mr. Revilla on Mr. Rotert's home. He has seen the Rotert Camaro one time, at a car wash.

The Court also heard the testimony of Maxwell Ryden ("Detective Ryden"), a detective with the Tulsa Police Department.[3] In the course of his duties, Detective Ryden investigated the theft of the Camaros from C & S. In the scope of his investigation, Detective Ryden was able to confirm that

---

changed his testimony to match his deposition testimony. This happened several times.

[3] The only objection made to Detective Ryden's testimony was that it was cumulative in nature. The objection was overruled. No other objections to his testimony were raised, and it was therefore admitted without exception.

one of the Camaros stolen from C & S was the Rotert Camaro.[4]  As part of his investigation, Detective Ryden interviewed two individuals, Mr. Stephenson and Steven Watson ("Mr. Watson"). Both confessed to the crime, and, in separate interviews, both implicated Mr. Rotert in the theft. According to Mr. Stephenson and Mr. Watson, those two individuals, along with Mathew Moreland ("Mr. Moreland") and Alonzo Johnson ("Mr. Johnson") stole the Camaros from C & S.  The Camaros were driven back to Oklahoma by Mr. Watson, Mr. Moreland, and Mr. Johnson.  Mr. Johnson was stopped for speeding and fled the scene, leaving his Camaro behind.  Mr. Stephenson later picked up Mr. Johnson, and the remaining two Camaros were driven to an apartment complex near the Arkansas/Oklahoma border.  These individuals returned to Tulsa, and contacted Mr. Rotert the next day.  At their request, Mr. Rotert drove his truck and trailer to the apartment complex, loaded up one of the Camaros, and drove it back to Tulsa.  The Rotert Camaro was driven back to Tulsa under its own power.

*The Burglaries*

While Mr. Rotert denies any involvement in the theft of the Rotert Camaro, he admits his role in a string of burglaries.  On December 17, 2007, Messrs. Rotert, Moreland, Revilla, and Stephenson stole a safe from a MidFirst Bank location in Tulsa.  They used a stolen wrecker to tear out an exterior wall of the bank.[5]  The safe was taken to Mr. Rotert's place of business in Tulsa, where his equipment was used to open the safe.  Several thousand dollars were taken from the safe, a portion

---

[4]  Confirmation that the Rotert Camaro was one of the stolen Camaros was done by comparison of vehicle serial numbers.

[5]  In December 2007, the City of Tulsa experienced a major ice storm.  As a result, power was out in several parts of the city for days or even weeks.  Apparently, no power equates to no burglar alarms.

of which was given to Mr. Rotert.  A similar burglary involving the same men occurred in Derby, Kansas in January 2008.  Mr. Rotert admits that he participated in the burglary and shared in its spoils.  Nevertheless, he claims to have been an unwilling accomplice in Derby, Kansas.  The Court does not find his testimony on this or any other issue to be credible.  Roberta Louise Rotert ("Mrs. Rotert"), Mr. Rotert's wife and the other defendant is this adversary proceeding, did not participate in either of these crimes, and had no knowledge of them at the time they were committed.

Eventually, criminal charges were filed against Mr. Rotert in the District Court in and for Tulsa County, Oklahoma, arising out of his possession of the Rotert Camaro and involvement in several burglaries (the "Criminal Case").  Mr. Rotert retained Mark Lyons, an attorney practicing in Tulsa ("Mr. Lyons") as his criminal counsel.  On April 13, 2011, Mr. Rotert entered a plea of "no contest" to four criminal charges:

1.  Possession of a stolen vehicle; namely, the Rotert Camaro;

2.  Participation in the MidFirst Bank burglary;

3.  Participation in a January 19, 2010, burglary of the Pink Bar in Tulsa, Oklahoma; and

4.  Participation in a January 29, 2010, burglary of American Bank and Trust in Tulsa, Oklahoma.[6]

As part of this plea, Mr. Rotert admitted that "if all of the State's witnesses appeared and testified to the evidence set forth in their reports and they are believed to the exclusion of all evidence presented by [Mr. Rotert]," the evidence would support his conviction for the crimes charged.[7]  He remains on probation for these crimes.

---

[6] *Plaintiff's Exhibit 3*.  The exhibit was admitted without objection.

[7] *Id.*

*Obtaining a Certificate of Title to the Rotert Camaro*

In February 2008, Mr. Rotert had a problem: he had possession of the Rotert Camaro, but no title.  In order to obtain a title to the Rotert Camaro, Mr. Rotert executed a power of attorney in favor of Linda B. Bray, Jamie Glass, and Chris Glass (the "POA").[8]  The POA included the following statement:

> I, Rodney, Rotert, dba D & R Fab of Tulsa in Tulsa County, Oklahoma have in my possession a number of vehicles on which I performed work at the request of the owner.  These vehicles have been abandoned by the owner, and have been stored on my property for a minimum of thirty (30) days.  In order to satisfy a possessory mechanic's or storage lien, I intend to sell these vehicles.
>
> Know all men by these presents that I the undersigned do hereby constitute and appoint Linda B Bray, Jamie Glass or Chris Glass as my true and lawful agent and attorney-in-fact to endorse in the name, place and stead of the undersigned authorization transferal of legal documents or papers required by the State of Oklahoma or any other agency for the purpose of obtaining title to the vehicle currently in my possession.
>
> I do hereby ratify and confirm whatever action said agent and attorney-in-fact may take in such regard by virtue hereof.  I also certify that the above mentioned agents will not be held responsible or liable for any legal action which may result from my filing for a possessory lien.  I further agree that all information regarding these vehicles will be accurate to the best of my knowledge.[9]

Under the auspices of the POA, James Glass prepared four documents:

1.  A Notice of Sale stating that the Rotert Camaro would be sold on February 1, 2008, at 10:00 a.m. to satisfy unpaid restoration charges of $12,681.50;

2.  A Proof of Posting and Mailing stating that the Notice of Sale was posted in at least two locations in Tulsa, Oklahoma, and one location in Sand Springs, Oklahoma;

3.  An Affidavit of Publication stating that the Notice of Sale was published three times in the Collinsville News; and

---

[8]  *Plaintiff's Exhibit 1.*

[9]  *Id.*

4.    A Return of Sale stating that a sale was held on February 1, 2008, and that the successful bidder at the sale was "D & R Fab," a business name used by Mr. Rotert.[10]

Using these documents, D & R Fab, which is either an entity owned by Mr. Rotert or a trade name used by Mr. Rotert, applied for and received an Oklahoma Motor Vehicle Title to the Rotert Camaro on February 26, 2008.[11]

There was one small problem with the sale procedure—it never happened.  Mr. Rotert did no restoration work on the Rotert Camaro.  There were no legitimate charges incurred by Mr. Rotert or D & R Fab.  The February 1, 2008, public sale of the Rotert Camaro was never held.[12]  The Court finds as a matter of fact that all of the sale documentation was false and was created for the sole purpose of inducing the State of Oklahoma to issue a title to the Rotert Camaro.  The Court further finds that Mr. Rotert was aware of and endorsed the entire process.[13]

---

[10]   *Id.*

[11]   *Id.*

[12]   The Court has no evidence as to whether there were any postings or publications regarding the sale of the Rotert Camaro.  Given the sham nature of the transaction, and the fact that no sale took place, it seems highly doubtful that any notice was posted or publication made.  One is also left to ponder why notice of the sale was published in Collinsville, Oklahoma when the sale was to be held in Tulsa, Oklahoma, some 22 miles away.  The Court takes judicial notice on its own motion of the fact that there are newspapers authorized to publish legal notices in the city of Tulsa, Oklahoma.

[13]   At trial, Mr. Rotert tried to distance himself from the sale process, claiming that all tasks were performed by Ms. Bray and Messrs. Glass without his knowledge.  In response to questions about the documents, Mr. Rotert chose his words carefully, stating that it "appeared" that the sale documents were false and, when questioned about the factual statements in the documents, he responded by stating "that's what they [the documents] say."  To the extent Mr. Rotert attempted to persuade the Court that he was an innocent bystander in the sham title process, he has failed. The Court finds that Mr. Rotert was fully aware of and supportive of the efforts to obtain a title to the Rotert Camaro under false premises.

*Acquisition of the Rotert Camaro: Purchase or Theft?*

We have two diametrically opposed stories as to how Mr. Rotert acquired the Rotert Camaro. On one hand, Mr. Rotert claims to have purchased the car from Mr. Revilla for cash plus a vehicle. He admits that he has no records to support his claim, and was never provided with a title to the Rotert Camaro. Mr. Rotert also denies any involvement in the theft of the Rotert Camaro, although he does admit to having the car in his possession. On the other hand, Mr. Revilla categorically denies having ever owned ***any*** Camaro, much less the Rotert Camaro. He denies selling the Rotert Camaro to Mr. Rotert. Detective Ryden testified without objection that the Rotert Camaro was one of the Camaros stolen from C & S, a fact proven by use of vehicle serial numbers. Detective Ryden also testified without objection that two individuals who admitted stealing the Camaros implicated Mr. Rotert in the transportation of the Camaros back to Tulsa, and described his involvement in great detail. The Court has no reason to doubt Detective Ryden's testimony. Finally, the evidence is uncontroverted that Mr. Rotert never obtained a legitimate certificate of title to the Rotert Camaro. Instead, he participated in a scheme to obtain title to the Rotert Camaro by means of fraud—namely, by creating a paper trail describing work that was never performed, a lien that never existed, and a sale that never took place. After considering all of the evidence, the Court concludes that the Rotert Camaro was stolen, that Mr. Rotert actively participated in its theft, and that he never purchased the vehicle in any way, shape, or form. The Court also finds that Mr. Rotert's testimony to the contrary was intentionally false, and given in hopes of misleading the Court. As a result, the Court gives little, if any, weight to any of the testimony of Mr. Rotert.

*The Taking of the Rotert Camaro and the State Court Action*

It appears that Mr. Rotert retained possession of the Rotert Camaro until May 11, 2009. On

that date,  J.J. Gray ("Gray") and Rick Eberle ("Eberle"), officers with the Tulsa Police Department, appeared at Mr. Rotert's place of business, stated that they were investigating the theft of the Rotert Camaro, and seized the vehicle.  The Tulsa Police Department determined that the Rotert Camaro was one of the Camaros stolen from C & S, and eventually turned it over to Philadelphia. Philadelphia did not dispose of the Rotert Camaro; instead, it placed the vehicle in storage with CoPart of Oklahoma, Inc. ("CoPart").

Nine months later, Mr. Rotert filed an action in the District Court in and for Tulsa County, Oklahoma (the "State Court"), against Philadelphia, CoPart, the City of Tulsa, Gray, Eberle, and John Does 1 through 5 (the "State Court Action").  Mr. Lyons represents Mr. Rotert in the State Court Action.  The State Court Action contains causes of action for conversion, civil conspiracy, abuse of process, replevin of the Rotert Camaro, and violation of civil rights.  In addition, Mr. Rotert sought a temporary restraining order and a permanent injunction preventing the sale or other disposition of the Rotert Camaro while the State Court Action was pending.   The factual underpinnings of the State Court Action lie in Mr. Rotert's allegations that he was the rightful owner of the Rotert Camaro and held valid title to the same as a result of the sale procedure previously described.  Mr. Rotert alleged that the seizure of the Rotert Camaro by the Tulsa Police Department was wrongful, as was the delivery of the Rotert Camaro to Philadelphia.  Mr. Rotert sought return of the Rotert Camaro, as well as hundreds of thousands of dollars in actual and punitive damages. In response, Philadelphia filed an answer and counterclaim, seeking damages as well as a declaratory judgment that it, and not Mr. Rotert, was the rightful owner of the Rotert Camaro.

The State Court Action remains unresolved, with the exception that CoPart has been dismissed as a party.  Initially, the State Court entered an order prohibiting the sale or disposal of the

Rotert Camaro, conditioned upon the posting of a cash bond by Mr. Rotert.  The bond amount was originally set at $500, but was later increased to $5,500 (the "Bond").  Mr. Rotert posted the Bond as required.  Eventually the restraining order was dissolved by agreement of the parties.  In addition, Philadelphia was awarded $800 in discovery sanctions against Mr. Rotert.  Philadelphia has also sought a judgment against Mr. Rotert for attorneys' fees in excess of $134,000, which remains pending.  Finally, Philadelphia has laid claim to the Bond to compensate it for storage costs and other damages associated with the retention of the Rotert Camaro during the pendency of the State Court Action.

*Destruction of Records*

In the years prior to 2013, Mr. and Mrs. Rotert (collectively, the "Roterts") were involved in two businesses: Club XS, LLC (the "Club") and D & R Fab.  The Club was in business from July 2009 until October 2011, while the business of D & R Fab was conducted over a nearly twelve year period from August 2000 until June 2012.  In the course of operating those businesses, the Roterts accumulated a significant number of records, including purchase records, invoices, and personal information relating to employees, such as income information and social security numbers.  For years, this information was stored at the Roterts' place of residence.

In late 2011 or early 2012, the Roterts received notice that their home was being foreclosed upon, and that they would be required to vacate the premises sometime in the summer of 2012.  In preparation for surrendering their house, the Roterts made the decision to destroy most, if not all, of the business records of the Club and D & R Fab.  The only records of these businesses that were intentionally retained were the tax returns relating to those entities.  The balance was destroyed over a period of weeks or months, some by shredding, some by burning.  Mrs. Rotert testified that the

records were destroyed because they were too voluminous to retain at the next place of residence and too costly to store, and because many of the records contained personal information of former employees.  None of the personal financial records of the Roterts were destroyed.

*The Bankruptcy Case*

On June 4, 2014, the Roterts filed a joint petition for relief under Chapter 7 of the United States Bankruptcy Code.  Scott P. Kirtley ("Mr. Kirtley") was appointed as trustee in the case.  In their initial schedules and statement of financial affairs, the Roterts did not disclose any interest in the Rotert Camaro.  They did not list Philadelphia or Mr. Lyons as creditors, even though Philadelphia had made counterclaims and sought fees in the State Court Action, and Mr. Lyons was owed money for his services in the State Court Action and perhaps in the Criminal Case as well.  In addition, while the Roterts listed several pending lawsuits to which they were parties by case number, neither the Criminal Case nor the State Court Action were listed in such detail.  The Criminal Case was entirely omitted from the schedules and statement of financial affairs, while the State Court Action was described as "Civil Rights Lawsuit against City of Tulsa Policy [sic] Department" in the Roterts' Schedule B.[14]  The State Court Action was claimed as an exempt asset by the Roterts, using the same description.

A first meeting of creditors was held in the Roterts' bankruptcy case on July 17, 2014.  At the meeting, the Roterts testified that their schedules were true and correct to the best of their knowledge and belief and that no amendments to the documents were required.  Despite not receiving notice of the bankruptcy case, Philadelphia appeared at the first meeting.  Upon questioning by counsel for Philadelphia, the Roterts refused to provide direct answers regarding their

---

[14] *Defendants' Exhibit 101* at 13.

11

ownership interest in the Rotert Camaro.[15]  On July 23, 2014, the Roterts amended their schedules

to address several of the deficiencies identified at the first meeting of creditors.[16]

Philadelphia filed this adversary proceeding on July 21, 2014, seeking to deny the Roterts

a discharge.  Philadelphia claims that the Roterts:

1.  Failed to list Philadelphia as a creditor in their schedules, even though they knew of Philadelphia's claim for attorneys' fees;

2.  Failed to list any interest in the Rotert Camaro as an asset in their schedules;

3.  Failed to list the $5,500 cash bond as an asset in their schedules;

4.  Failed to list a criminal action pending against Mr. Rotert in their statement of financial affairs;

5.  Failed to list the claim for attorney fees and counterclaim brought against them by Philadelphia in the Lawsuit in their statement of financial affairs;

6.  Gave vague and incomplete answers at the first meeting of creditors regarding the disposition of assets in the year prior to the filing of their bankruptcy case; and

7.  Failed to keep or preserve records necessary to determine what had happened to their assets.

Philadelphia also claims that Mr. Rotert refused to answer questions at their first meeting of

creditors, stating that he feared a perjury charge were he to answer questions pertaining to the Rotert

Camaro.  On the basis of these allegations, Philadelphia argues that the Roterts should be denied a

---

[15]  Mr. Rotert testified that counsel for Philadelphia was belligerent at the first meeting of creditors, and acted in a somewhat threatening manner.  The Court was provided a copy of the audio recording of the first meeting of creditors, and disagrees with Mr. Rotert's testimony.  While Philadelphia's counsel was certainly less than satisfied with the answers given by Mr. Rotert, and frustrated with the attempts by Mr. Kirtley and Mrs. Rotert to limit his questioning and interrupt Mr. Rotert's answers, he did not act improperly.  There is no fault to be found in tenacity.

[16]  *Defendants' Exhibit 108(a), (b), and (c).*

discharge under § 727(a) (2),(3),(4), and/or (6) of the Bankruptcy Code.[17]   The complaint contains

no claim that the debt owed by the Roterts to Philadelphia is nondischargeable under § 523.

To the extent the "Conclusions of Law" contain any items that should more appropriately be

considered "Findings of Fact," they are incorporated herein by this reference.

### Burden of Proof

In order to prevail on an objection to discharge, the plaintiff must prove each statutory

element by a preponderance of the evidence.[18]   Once the plaintiff establishes a prima facie case for

denying a defendant's discharge under § 727, the burden of going forward shifts to the defendant.[19]

The ultimate burden, however, remains with the plaintiff.[20]   In order to further the policy of

providing a debtor with a "fresh start," "the Bankruptcy Code must be construed liberally in favor

of the debtor and strictly against the creditor."[21]   Even so, "a discharge in bankruptcy is a privilege,

not a right, and should only inure to the benefit of the honest debtor."[22]

---

[17]  *Id., Docket No. 1.*

[18]  *See* Fed. R. Bankr. P. 4005.  *See also First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991); *cf. Grogan v. Garner*, 498 U.S. 279 (1991).

[19]  *See Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984); *Everspring Enters., Inc. v. Wang (In re Wang),* 247 B.R. 211, 214 (Bankr. E.D. Tex. 2000).

[20]  *See First Union Nat'l Bank v. Golob (In re Golob),* 252 B.R. 69, 75 (Bankr. E.D. Va. 2000) (citing *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249 (4th Cir. 1994)).

[21]  *Mathai v. Warren (In re Warren),* 512 F.3d 1241, 1248 (10th Cir. 2008) *(*quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997)).

[22]  *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

## Conclusions of Law

*Section 727(a)(2)(A)*

Section 727(a)(2)(A) of the Code provides that a discharge may be denied where

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition[.][23]

This exception to discharge consists of two critical pieces: 1) an act, i.e, a transfer or a concealment, involving property of the debtor; and 2) a subjective intent to hinder, delay, or defraud a creditor.[24] Both the act and the intent must be present during the one year before the petition date. "Anything occurring before that one year period is forgiven."[25]

The Court does not reach any of the § 727(a)(2)(A) issues as they may pertain to Mr. Rotert because the fate of his bankruptcy discharge is decided under § 727(a)(4) *infra*. As to Mrs. Rotert, there is no evidence that she ever claimed any interest in the Rotert Camaro or the State Court Action. Nor has Philadelphia met its burden of proof to show that Mrs. Rotert had any intent to hinder, delay, or defraud her creditors. To the extent Philadelphia seeks to deny Mrs. Rotert a

---

[23] § 727(a)(2)(A).

[24] *Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir. 1993). *See also In re Warren*, 512 F.3d at 1249 ("[A] party objecting to a discharge under this section 'must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.'" (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997))).

[25] *Rosen*, 996 F.2d at 1531.

14

discharge under § 727(a)(2), the request is denied.

*Section 727(a)(3)*

This Court first addressed the issue of denial of discharge under § 727(a)(3) almost twelve years ago.[26]  In this area of the law, little has changed.  Section 727(a)(3) reads as follows:

The court shall grant the debtor a discharge, unless–

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.][27]

The United States Court of Appeals for the Tenth Circuit has held that in order to sustain a claim under § 727(a)(3), the plaintiff must establish that the debtor "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material business* transactions."[28]  "Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business.  It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them."[29]

Factors that a court may take into account when determining the sufficiency of disclosures

---

[26]  *See Crane v. Morris (In re Morris)*, 302 B.R. 728 (Bankr. N. D. Okla. 2003) (hereafter "*Crane*").

[27]  § 727(a)(3).

[28]  *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997) (emphasis in original) (citation omitted).

[29]  *Hedges v. Bushnell*, 106 F.2d 979, 982 (10th Cir. 1939), *cited with approval in The Cadle Company v. Stewart, (In re Stewart),* 263 B.R. 608, 615 (10th Cir. BAP 2001), *aff'd*, 35 F. App'x 811 (10th Cir. 2002).  *See also Henkel v. Green (In re Green)*, 268 B.R. 628, 647 (Bankr. M.D. Fla. 2001).

include:

1.  Whether the debtor was engaged in business, and if so, the complexity and volume of the business;

2.  The amount of the debtor's obligations;

3.  Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;

4.  The debtor's education, business experience and sophistication;

5.  The customary business practices for record keeping in the debtor's type of business;

6.  The degree of accuracy disclosed by the debtor's existing books and records;

7.  The extent of any egregious conduct on the debtor's part; and

8.  The debtor's courtroom demeanor.[30]

The decision as to whether the books and records provided are sufficient is to be made on a case by case basis, and is a matter left to the discretion of the bankruptcy court.[31]  Some courts have held that the bankruptcy court has the discretion to allow the entry of a discharge even if grounds for its denial are found.[32]

In this case, the evidence before the Court is that the Roterts destroyed records relating to two of their businesses approximately two years prior to the filing of their bankruptcy case.  With respect to those businesses, the Roterts retained the relevant tax returns and documents.  None of their

---

[30]  *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000) (citation omitted).

[31]  *Id.*

[32]  *Union Planters Bank v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002) (citation omitted); *Miami Nat'l Bank v. Hacker (In re Hacker)*, 90 B.R. 994, 998-99 (Bankr. W.D. Mo. 1987); *Citizens Bank of Jonesboro v. Anglin (In re Anglin)*, 89 B.R. 35, 36 (Bankr. W.D. Ark. 1988).

personal records were destroyed.  None of the records pertaining to the State Court Action or the Rotert Camaro are alleged to have been destroyed.[33]  In addition, destruction of the records does not appear to have been in contemplation of bankruptcy, and appears to have been a reasonable decision, given that the Roterts were facing foreclosure and relocation and that some of the records contained personal information relating to former employees.  Philadelphia has shown no harm as a result of the destruction of the records relating to the Club and D & R Fab.  The Court declines to deny the Roterts a discharge under § 727(a)(3).

*Section 727(a)(4)(A)*

Section 727(a)(4)(A) of the Code provides that a discharge may be denied where "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account[.]"[34] The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[35]

The Fourth Circuit has held that

---

[33]  The one possible exception to this statement lies in Mr. Rotert's statement that he made one of the $5,000 payments for the Rotert Camaro to Mr. Revilla using a personal or cashier's check, and that no documentation relating to that payment exists.  Given the Court's finding that Mr. Rotert did not purchase the Rotert Camaro from Mr. Revilla, the Court has little concern over the fact that no proof exists for a transaction that never took place.

[34]  § 727(a)(4)(A).

[35]  *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted).

[i]n order to be denied a discharge under this section [§727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. The false oath made by the debtor must have related to a material matter. Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.[36]

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from the same may constitute a false oath for purposes of § 727(a)(4)(A).[37] Omitted information has been deemed material where it "concerns . . . the existence and disposition" of a debtor's property.[38] Because the debtor is usually the only person able to testify directly concerning intent, "fraudulent intent may be deduced from the facts and circumstances of a case."[39] A "reckless indifference to the

---

[36] *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) (citations omitted). *See also Gullickson v. Brown (In re Brown)*, 108 F.3d at 1294 ("In order to deny a debtor's discharge pursuant to this provision [§ 727(a)(4)(A)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact.").

[37] *See Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990).

[38] *Id.* (citing *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)).

[39] *Id.* at 955-56. Although not directly on point, the Court has found helpful certain cases dealing with revocation of discharge for failure to disclose assets under § 727(d)(2). The United States Court of Appeals for the Seventh Circuit has held that

[t]o find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud. The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied. The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct. Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances.

*In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) (citations omitted). *See also Kaler v. Olmstead (In re Olmstead)*, 220 B.R. 986, 994 (Bankr. D.N.D. 1998) (quoting *Yonikus*); *Rezin v. Barr (In re Barr)*, 207 B.R. 168, 176 (Bankr. N.D. Ill. 1997) (fraud "may be proven by evidence that Debtors were

truth has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)."[40]  At least one court has noted that "the greater the number of assets or transactions that are not disclosed, the greater the inference of intent to defraud."[41]

The United States Court of Appeals for the Tenth Circuit has given us further guidance in the application of § 727(a)(4)(A).  It has held that "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence."[42]  We have also been instructed that "an honest error or mere inaccuracy is not a proper basis for denial of discharge."[43]  But a debtor may not escape a denial of discharge under § 727(a)(4)(A) by asserting that the omitted information concerned assets that he or she believed to be worthless.[44]

At the time this case was filed, Mr. Rotert claimed an interest in the Rotert Camaro.  He was aware that Philadelphia asserted claims against him.  Neither the asset nor the liability were disclosed

---

aware the omitted assets existed and that they knew failure to list the assets would mislead creditors or the Trustee").

[40]  *The Cadle Company v. King (In re King)*, 272 B.R. 281, 302 (Bankr. N.D. Okla. 2002) (*quoting In re Tully*, 818 F.2d 106, 112 (1st Cir. 1987)). *See also Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011); *Booth v. Booth (In re Booth)*, 70 B.R. 391, 395 (Bankr. D. Colo. 1987) (finding "a reckless indifference to the truth by the debtor" to be among the "badges" whose existence may establish fraudulent intent under § 727).

[41]  *Law Office of Larry A. Henning v. Mellor (In re Mellor)*, 226 B.R. 451, 459 (D. Colo. 1998) (citing *In re Calder*, 907 F.2d at 956 (finding "not one but four separate omissions")). *See also Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d at 252 ("not one false oath, but three, and that the effect of these false oaths was to conceal from the bankruptcy court and the trustee a pattern of gratuitous transfers of property").

[42]  *In re Brown*, 108 F.3d at 1294.

[43]  *Id.* at 1295.

[44]  *In re Calder*, 907 F.2d at 955 (citing *In re Chalik*, 748 F.2d 616 (11th Cir. 1984)).

in his schedules, nor was Philadelphia listed as a creditor on the original list of creditors filed with the Court.  Although the State Court Action was nominally described in the initial bankruptcy schedules, it was not described with any particularity, a fact that is especially striking in light of the fact that Mr. Rotert described other pending litigation in great detail, i.e., by case name and docket number.  Nor did Mr. Rotert list Mr. Lyons as a creditor, even though he knew he owed Mr. Lyons money for his services.  The Court finds these omissions by Mr. Rotert were intentionally made in the hopes that his interests in the Rotert Camaro and the State Court Action would escape the claims of Mr. Kirtley, and remain in Mr. Rotert's control.  The failure to disclose assets, liabilities, and pending litigation all constitute false oaths, and justify denial of Mr. Rotert's discharge under § 727(a)(4)(A).

Mr. Rotert argues that the fact that he amended the bankruptcy schedules after the first meeting of creditors negates any inference of fraudulent intent.  The Court disagrees.  Other courts have noted that amendments made after the discovery of omitted information do not necessarily cleanse a debtor's intent.

> As a matter of law, no inference of fraudulent intent can be drawn from an omission when the debtor promptly brings it to the court's or trustee's attention absent other evidence of fraud. *In re Brown*, 108 F.3d at 1294. Further, a debtor's voluntary filing of an amendment as soon as practicable may be accepted as evidence of the absence of the element of the fraudulent intent necessary to sustain a § 727(a)(4)(A) claim. *In re Kelly*, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992); *In re Shebel*, 54 B.R. 199, 202-205 (Bankr. D. Vt. 1985). <u>An inference of fraud is permissible, however, when the evidence indicates that the amendment is not in fact voluntary because the amendment is offered only as a result of developments during the meeting of creditors, after the debtor "knew that the cat was out of the bag," well after the meeting of creditors, or without adequate explanation of the reason for their initial inaccuracy.</u> *In re Mumin*, 1998 WL 160992, *3 (Bankr. E.D. Pa. 1998) (unpublished opinion) (collecting multiple cases).[45]

---

[45] *In re Mellor*, 226 B.R. at 459–60 (emphasis added).

In prior unpublished decisions and numerous rulings from the bench, this Court has repeatedly and consistently said that the filing of bankruptcy schedules and statements of financial affairs is not a game of "catch me if you can."  When a debtor fails to disclose material information and the information is later discovered by a trustee or revealed to the trustee by a creditor, amendments to the schedules and/or statement of financial affairs to reflect the independently discovered information carry little weight on the issue of good faith.  If every debtor could cleanse the slate of full disclosure by revealing that which was once hidden but now revealed, the test for good faith becomes meaningless, and the world of bankruptcy disclosure truly devolves into an unacceptable game of "catch me if you can."  The Court does not find that subsequent disclosure absolves Mr. Rotert of knowingly and fraudulently omitting the State Court Action and his claimed interest in the Rotert Camaro from his schedules.

In the eyes of the Court, the record does not support denial of Mrs. Rotert's discharge under § 727(a)(4)(A).  She is not a party to the State Court Action, and (at least on the evidence before the Court) has never claimed an ownership interest in the Rotert Camaro.  She did not engage in Mr. Rotert's course of fraudulent conduct with respect to the Rotert Camaro, i.e., she did not help steal the car, conceal the car, or obtain a certificate of title to it under false pretenses.  As a result, the Court does not ascribe the same intent to mislead the Court and Mr. Kirtley to Mrs. Rotert that it ascribes to Mr. Rotert, and declines to deny her a discharge under § 727(a)(4).

*Section 727(a)(6)*

Section 727(a)(6) provides a debtor shall be denied a discharge when

the debtor has refused, in the case—

(A) to obey any lawful order of the court, other than an order to

21

> respond to a material question or to testify;
>
> (B) on the ground of privilege against self-incrimination, to respond to a material question approved by the court or to testify, after the debtor has been granted immunity with respect to the matter concerning which such privilege was invoked; or
>
> (C) on a ground other than the properly invoked privilege against self-incrimination, to respond to a material question approved by the court or to testify[.][46]

Each subsection of § 727(a)(6) requires some form of court involvement, whether it be a direct order to give testimony, the granting of immunity, or approval of a question submitted to the court for review.  If none of these prerequisites are present, § 727(a)(6) does not come into play.

In this case, Philadelphia claims that the answers given by the Roterts at their first meeting of creditors constitute "failure to respond to a material question . . . or to testify" for purposes of § 727(a)(6)(C).[47]  The problem lies in the ellipse contained in the previous sentence: court approval of the questions the Roterts have allegedly failed to answer has been neither sought nor obtained. The lack of court approval dooms any claim under § 727(a)(6)(C):

> Section 727(a)(6)(C) denies a discharge to a debtor who refuses to respond to a material question approved by the court or refuses to testify on any ground other than the properly invoked privilege against self-incrimination. This section applies when the debtor refuses to answer a "material question approved by the court."
>
> "Court" means a judge, and not a trustee, United States trustee or other official. The debtor's refusal to answer a question that has not been approved by the court is not a basis for denial of a discharge. Thus, a refusal to answer questions in a creditors' meeting or a deposition is not grounds for denial of discharge if, when the court

---

[46] § 727(a)(6).

[47] The Court finds that the only possible subsection of § 727(a)(6) that could apply in this case is subsection (C).  There has been no court order to provide testimony, nor has this or any other court granted the Roterts any manner of immunity.  By process of elimination, we are left with subsection (C).

subsequently approves the question, the debtor answers it.  If court approval is never sought, the debtor is not required to answer the question.[48]

To the extent Philadelphia seeks to deny the Roterts a discharge under the provisions of § 727(a)(6), the request is denied.

### Conclusion

Mr. Rotert shall be denied a discharge in this case under § 727(a)(4)(A).  Mrs. Rotert shall be granted her discharge.  A separate judgment in accordance with this Memorandum Opinion shall be entered concurrently herewith.

Dated this 1st day of December, 2015.


BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT


6937.5

---

[48]  6 *Collier on Bankruptcy* ¶ 727.09[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (footnotes omitted), *cited with approval in Merena v. Merena (In re Merena)*, 413 B.R. 792, 819 (Bankr. D. Mont. 2009).